Filed 1/13/21  Paniagua v. Milestone Financial, LLC CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| EDUARDO PANIAGUA et al.<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>MILESTONE FINANCIAL, LLC et al.,<br><br>Defendants and Appellants. | A157183<br><br>(San Francisco County<br>Super. Ct. No. CGC18571279) |

Eduardo Paniagua obtained a loan from Milestone Financial LLC (Milestone), secured by a home owned by Paniagua and his wife.  When the couple sued Milestone and related individuals and entities, defendants invoked mandatory arbitration provisions in several of the parties' agreements.  The trial court denied defendants' motion to compel arbitration, finding the agreements void due to the defendants' misrepresentations that they had the licenses required to lawfully engage in the transactions.  On this appeal, defendants contend the trial court's decision was unsupported by the evidence and contrary to law.  We affirm.

## BACKGROUND

Paniagua and his wife, Elena Asturias, own a single family home on Funston Avenue in San Francisco which, according to the allegations of the complaint, has been in their family for over 50 years.  Plaintiffs acquired the

1

property in 2009, from Asturia's 84-year-old mother and elderly aunt "for the purpose of rehabilitating the property and adding value and to subsequently liquidate the added value so that such funds could be used for the mother's retirement fund, and, to help pay for the aunt's ongoing expensive cancer treatments."

On March 11, 2014, Paniagua signed a promissory note for a $500,000 loan from Milestone, with a maturity date of March 31, 2016, secured by the residential property on Funston Avenue. The promissory note states that the borrower "represents and warrants that the proceeds from the Note (i) are strictly for business, commercial, or investment purposes ONLY, (ii) will not be used primarily for farming, personal, family, household or other consumer purposes," and "acknowledges that this Note was negotiated and arranged by a licensed real estate broker." Paniagua also signed an "Affidavit Regarding Loan Purpose" stating that the "proceeds of the Loan is or shall be for either business, commercial or investment purpose" and the "proceeds of the Loan is or shall not be used primarily for agricultural, farming, personal, family, household or other consumer purposes." A "Disbursement Request & Authorization" directed disbursement of an initial $100,000 to Old Republic Title Company to close escrow and subsequent disbursements upon completion of designated items on an "Estimate for Remodeling and Addition at 1228 Funston Avenue . . . ." The promissory note recites that it, and each of the loan documents, were negotiated, prepared and arranged through MJF Funding, Inc. (MJF).[1]

---

[1] On the same day he signed the promissory note, Paniagua entered into an "Agreement to Arrange Credit" with MJF. Some of the documents related to the loan refer to the arranging broker as Blue Water Funding, a doing business as name used by MJF.

On April 27, 2015, the California Bureau of Real Estate issued a "desist and refrain" order against Milestone, Bear Bruin Ventures, Inc. (Bear Bruin), doing business as Page Mill Funding, Carolyn Stuart, William Stuart, and Zoe Hamilton,[2] after an investigation concluded that over a time period beginning in March 2014, they had engaged in activities requiring a real estate license and/or mortgage loan originator license endorsement, without having such licenses and/or endorsements, in violation of Business and Professions Code[3] sections 10130 (acting as real estate broker without a license), 10131, subdivision (d) (soliciting, negotiating, performing services in connection with loans secured by real property), and 10166.02, subdivision (b) (failing to obtain mortgage loan originator license endorsement.[4] The Stuarts and Bear Bruin were ordered to refrain from performing any acts for which a mortgage loan originator license endorsement is required unless and until such endorsement was obtained from the Bureau; Milestone and Hamilton were ordered to refrain from performing any acts requiring a real estate

---

[2] William Stuart's declarations state he is the manager of Milestone. He signed certain documents in the record on behalf of Milestone as President of Bear Bruin, indicated to be Milestone's manager. Zoe Hamilton signed correspondence related to the Paniagua loan as processor for Page Mill Funding.

[3] Subsequent statutory references will be to the Business and Professions Code except as otherwise indicated.

[4] A "mortgage loan originator" is "an individual who takes a residential mortgage loan application or offers or negotiates terms of a residential mortgage loan for compensation or gain." (§ 10166.01, subd. (b)(1).)

" 'Residential mortgage loan' means any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling, or residential real estate upon which is constructed or intended to be constructed a dwelling." (§ 10166.01, subd. (d).)

broker's license or mortgage loan originator endorsement are required until such license and endorsement were obtained from the Bureau.[5]

On January 26, 2016, with Paniagua unable to pay off or refinance the loan by the maturity date of March 31, 2016, he and Milestone entered a "Settlement Agreement, Indemnity and First Amendment to Promissory Note Secured by Deed of Trust" extending the maturity date to March 31, 2017. The stated balance at that time was $425,631.44. The agreement, which recited it had been reviewed by Paniagua with counsel and there was no basis for arguing it was invalid, unenforceable or unconscionable, included a consent to mandatory arbitration and acknowledgment by Paniagua that Milestone would not have entered into the agreement "without the express terms set forth in the arbitration clause . . . ."

On January 20, 2017, Paniagua and Milestone entered another agreement extending the maturity date to March 31, 2019. The stated balance at this time was $444,478.48. The agreement contained the same acknowledgement of review by counsel and again contained a consent to mandatory arbitration and acknowledgement that the mandatory arbitration provision "is extremely material to the Agreement" and Milestone would not have entered into the agreement without its express terms.

---

[5] According to the findings of fact in the Bureau's 2015 order, at all times mentioned, William and Carolyn Stuart were each licensed as real estate brokers and neither had obtained a mortgage loan originator license endorsement; Hamilton had been licensed as a real estate salesperson but her license had expired on December 22, 2004, and not been renewed, and she had not obtained a mortgage loan originator endorsement; Bear Bruin, doing business as Page Mill Funding, was licensed as a corporate real estate broker and had not obtained a mortgage loan originator endorsement; and Milestone was not licensed by the Bureau in any capacity and had not obtained a mortgage loan originator endorsement.

4

On April 14, 2018, Paniagua signed a "Payoff Approval & Acknowledgement" that also included an arbitration provision. He was represented in negotiating this agreement by attorney Victor Marquez.

On November 13, 2018, plaintiffs filed a complaint against Milestone, Bear Bruin, William Stuart, Carolyn Stuart and Zoe Hamilton, alleging causes of action for fraud, negligence, violation of the Unfair Competition Law (§ 17200), False Advertising Act (§ 17500) and Consumer Remedies Act (Civ. Code, § 1750), and violation of article XV, section 1 et seq., of the California Constitution.

Plaintiffs alleged that in entering into the loan agreement with Milestone, they relied upon advertisements for Milestone's "fast quotes," "fast closings" and "competitive rates" as a "wholesale direct lender," and representations on Milestone's website that the Stuarts were officers of Milestone and licensed real estate brokers. They alleged that at the time of their loan, Milestone was not licensed to enter into a residential mortgage loan but misrepresented that it was, and that they would not have contracted with the defendants if they had known the defendants were unlicensed and prohibited from making loans. They further alleged that while the defendants were promoting themselves and making loans, the Bureau initiated an investigation of Milestone, during which Hamilton, on behalf of Milestone, solicited and/or offered to negotiate the terms of a residential mortgage loan for the investigator, and that the Bureau issued desist and refrain orders against defendants on or about March 13, 2015, and April 27, 2015, but defendants did not inform plaintiffs of these orders.

Plaintiffs further alleged that they entered the January 2017 loan modification agreement after defendants threatened to initiate foreclosure

proceedings; this agreement contained an interest rate exceeding the constitutional maximum;[6] Milestone unlawfully refused to divulge pay-off amounts due when plaintiffs requested this information; defendants unlawfully pressured plaintiffs into entering the new loan agreement despite being subject to the Bureau's desist and refrain orders; plaintiffs were forced to accept the terms of the modification due to defendants' continued threats of foreclosure; and despite coming to an agreement and promising to refrain from filing a notice of default, defendants filed such notice in March 2018, resulting in harm to plaintiffs' credit.

Defendants filed a petition to compel arbitration, relying upon the mandatory arbitration provisions in the settlement agreements and the payoff agreement, which they argued plaintiffs could not avoid because the arbitration agreements were not substantively and procedurally unconscionable. Defendants maintained the loan was a "business purpose loan for construction" and Paniagua was represented by his own licensed loan broker; Milestone did not violate the Bureau's order because the loan was for a business purpose, the lender is not required to itself be a licensed real estate broker where the loan is for a business purpose and arranged through a licensed real estate broker, and a mortgage originator endorsement is

---

[6] Plaintiffs alleged that the modification agreement contained a 19.75 percent annual interest rate (increased from the 10.75 rate specified in the original loan agreement), plus a 10 percent penalty clause for late payments which was applied to both principal and interest payments on the January 20, 2017 loan amount, in violation of the 10 percent maximum permitted under the California Constitution (Cal. Const., art. XV, § 1). The exception for licensed real estate brokers engaged in lending activities (see Civ. Code, § 1916.1), plaintiffs alleged, did not apply because Milestone did not have the requisite license.

required only for loans primarily for personal family or household use secured by real property; and the interest rate was not usurious.[7]

Opposing the petition, plaintiffs maintained that defendants unilaterally selected MJF to " 'represent' " Paniagua as broker in the transaction, and worked with MJF to prepare the documents without plaintiffs' consent or input; defendants were unlicensed and legally barred from issuing or entering into the loan agreement in March 2014, and later restrained from issuing any residential mortgage and consumer loans by the Bureau's desist and refrain order; plaintiffs entered the agreement to modify the terms of the loan, which contains the arbitration provision, under threat of default and foreclosure; and the modification agreement was an adhesion contract in that plaintiffs had either "lose their home or agree to the exorbitant fees and interest rates" defendants demanded, as well as the arbitration provisions. Plaintiffs asserted the agreement was for a residential mortgage loan and defendants' characterization of it as a business purpose loan, and reliance on the presence of a broker in the transaction, was the "business model" for which they had been under investigation. Arguing that the affidavit of purpose and statements of purpose were unenforceable and unconscionable, plaintiffs stated Paniagua has limited English proficiency and was asked to sign the documents—prepared by defendants and MJF—with no opportunity to bargain for the terms.

---

[7] According to defendants, there was no violation of the constitutional usury provisions (Cal. Const. art. XV, § 1) because Civil Code section 1916.1, makes the constitutional restrictions on interest rates inapplicable to loans made or arranged by a licensed real estate broker and secured by lien on real property, and plaintiffs were represented by a licensed real estate broker in entering the agreements.

7

Plaintiffs argued the arbitration provisions were void because the agreements containing them were illegal and Paniagua was induced to enter them by the defendants' fraud; the issue of illegality of the contract had to be established before any final ruling on the enforceability of the arbitration clause; and the illegality could be deduced from the facts pleaded, or "upon additional limited discovery and supplemental briefing."

Defendants, in their reply, asserted that in arguing the loan was not for a business purpose, Paniagua was improperly using "his own unclean hands and apparent fraud and deception as a sword," as he admitted signing documents representing to the lender that the loan was for a business purpose. Defendants argued plaintiffs' factual arguments were unsupported by admissible evidence; the Bureau's orders did not impose a bar on all loans; plaintiffs were not forced to sign the contracts and were free to seek a loan or refinancing from a different lender; the agreements were easily modifiable Microsoft Word documents, but plaintiffs never requested any changes; the terms were not unconscionable; and, pursuant to the arbitration provisions, the arbitrator should decide any questions about arbitrability.

The trial court denied defendants' petition to compel arbitration. Recognizing that plaintiffs alleged they were fraudulently induced to enter the loan agreements by defendants' fraudulent misrepresentations and omissions, and sought rescission of the agreements, the court held that the Bureau's cease and desist order and findings provided substantial evidence that at the time plaintiffs entered into the original loan agreement, "Milestone and Hamilton were misrepresenting to the public that they were licensed to act as real estate broker, real estate salesperson, and/or mortgage loan broker, when in fact they lacked the real estate broker licenses, real estate licenses, and mortgage loan originator endorsements required by

8

statute.  This evidence is sufficient to support 'a preliminary factual determination that misleading circumstances existed and led to the entry into the agreements, supporting a conclusion the agreements are void.  These conclusions apply to avoid the arbitration clauses contained within the agreements.' (*Duffens* [*v. Valenti* (2008)] 161 Cal.App.4th [434,] 448.)"[8]

## DISCUSSION

Defendants contend the trial court erred in denying the petition because the loan complied with applicable laws and did not violate the Bureau's desist and refrain order, plaintiffs' fraud claims are of a type that must be decided by the arbitrator rather than the court, and the court's decision was not supported by evidence.

Although differing in specific phrasing, the arbitration provisions in the two settlement agreements provided for disputes, claims or controversies "arising out of or relating to this Agreement, the Note, the Deed of Trust and

---

[8] Plaintiffs ask us to take judicial notice pursuant to Evidence Code section 452, subdivisions (c) and (h), of records of additional disciplinary action taken by the Bureau after the trial court's ruling.  The first is an accusation filed on April 24, 2019, against Bear Bruin and Carolyn Stuart for conduct including engaging in the business of a mortgage loan originator (§ 10166.01, subd. (b)(1)), on behalf of Milestone, without having obtained a mortgage loan originator endorsement, with respect to (but not limited to) a transaction with a closing date of April 26, 2016.  The second is an order of the Department of Real Estate accepting Bear Bruin's and Stuart's voluntary surrender of their real estate corporation broker and designated broker officer licenses effective November 26, 2019.

Defendants oppose the request for judicial notice, arguing the documents are irrelevant because the loan in the present case was arranged by an independent broker, the voluntary surrender of licenses does not admit the allegations of the accusation, and the request for judicial notice is untimely.  Although we do not find the opposition persuasive, the documents at issue are not necessary to our decision and we decline the request for judicial notice on that basis.

9

any related documents, . . . including the determination of the scope or applicability" of the arbitration agreement,[9] to be determined by arbitration as detailed in the agreement. The arbitration clause in the payoff agreement similarly provided for arbitration of disputes, claims or controversies arising out of or relating to "this Agreement . . . , including the determination of the scope or applicability of this agreement to arbitrate."

Pursuant to Code of Civil Procedure section 1281.2, "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] . . .[¶] "(b) Grounds exist for rescission of the agreement. . . ."

The statute has been interpreted as referring to grounds for rescission of the arbitration agreement, rather than grounds for rescission of the entire contract: "[S]ection 1281.2 requires enforcement of the *arbitration* agreement unless there exist grounds for revocation of that agreement."[10] (*Moncharsh v.*

---

[9] The first settlement agreement referred to the scope or applicability of "this Agreement to arbitrate"; the second settlement agreement referred to the scope or applicability of "this mandatory arbitration proceeding."

[10] Prior to an amendment effective January 1, 2019, section 1281.2, subdivision (b), referred to grounds for "revocation" of the agreement. (Stats. 2018, ch. 106, § 1.) Before this amendment, the California Supreme Court had referred to use of the term "revocation" as "something of a misnomer" because only offers to create a contract can be revoked, while an existing contract can be undone only by rescission. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973.) The 2018 statutory amendment was intended to correct the "misnomer." (Sen. Rules Com., Off. of Sen Floor Analyses, Analysis of Assem. Bill No. 3247 (2017–2018 Reg. Sess.) June 22, 2018.)

*Heily & Blase* (1992) 3 Cal.4th 1, 29 (*Moncharsh*).) Nevertheless, "[i]f a contract includes an arbitration agreement, and grounds exist to revoke the entire contract, such grounds would also vitiate the arbitration agreement. Thus, if an otherwise enforceable arbitration agreement is contained in an illegal contract, a party may avoid arbitration altogether." (*Ibid.*) On the other hand, where "the alleged illegality goes to only a portion of the contract (that does not include the arbitration agreement), the entire controversy, including the issue of illegality, remains arbitrable." (*Ibid.*)

"In ruling upon a petition to compel arbitration, the superior court is allowed to determine arbitrability issues, such the existence and validity of the arbitration agreement, by utilizing summary motion procedures. (*Rosenthal* [*v. Great Western Financial Securities Corp.* (1996)] 14 Cal.4th 394, 409.) These procedures are consistent with the use of private arbitration as a means of resolving disputes quickly and inexpensively. (*Ibid.*) '[T]he superior court does not decide whether the plaintiff's causes of action have merit, although some factual questions considered in deciding the application may overlap those raised by the plaintiff's claims for relief. The only question implicated by the petition to compel arbitration is whether the arbitration agreements should be specifically enforced. . . . [T]he superior court decides only the facts necessary to determine specific enforceability of an arbitration agreement, an equitable question as to which no jury trial right exists.' (*Id.* at p. 412.)" (*Duffens v. Valenti, supra,* 161 Cal.App.4th at p. 444 (*Duffens*).)

Defendants dispute the fundamental premise of plaintiffs' position and the trial court's ruling, maintaining that the loan was explicitly for business purposes, as stated in the agreements and affidavit of purpose Paniagua signed, and therefore did not violate any licensing requirements or the Bureau's desist and refrain order. They maintain that a mortgage loan

originator endorsement is only required for loans "primarily for personal, family, or household use" (§ 10166.01, subd. (d)), and that the lender for a business purpose loan arranged through a licensed real estate broker is not required to itself be a licensed real estate broker. For the latter point, defendants argue the license generally required for finance lenders or brokers (Fin. Code, §§ 22100) is not required for loans made or arranged by a licensed real estate broker and secured by a lien on real property (Fin. Code, § 22057); here they maintain, the loan was arranged by Paniagua's licensed real estate broker.

Plaintiffs argue the agreements were for a residential mortgage loan and were illegal in that defendants did not have the licenses required to enter into a residential mortgage loan (§§ 10130 [real estate broker license requirement], 10131, subd. (d) [soliciting, negotiating, servicing loans secured by real property], 10166.02, subd. (b) [mortgage loan originator license endorsement requirement for broker making, arranging, servicing loans secured by residential real property]), and defendants fraudulently induced Paniagua to enter the agreements by conduct including misrepresenting their licensing status, failing to disclose the Bureau's disciplinary action, conspiring with a broker they selected to ostensibly represent Paniagua and presenting Paniagua with documents created to immunize defendants from the licensing requirements.

Although the trial court's decision did not discuss the parties' dispute as to the purpose of the loan, the decision refers to "the original residential mortgage loan agreement." The court thus implicitly rejected defendant's argument that the loan was for business purposes. The evidence supports this preliminary factual conclusion that it was a residential mortgage loan.

12

As earlier indicated, a residential mortgage loan is "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling, or residential real estate upon which is constructed or intended to be constructed a dwelling." (§ 10166.01, subd. (d).) The loan was secured by plaintiffs' family residence, and its documented purpose was renovation of that home. According to plaintiffs' verified complaint, the residence had been in plaintiffs' family for more than 50 years and plaintiffs acquired it from Asurias's 84-year-old mother and elderly aunt "for the purpose of rehabilitating the property and adding value and to subsequently liquidate the added value so that such funds could be used for the mother's retirement fund, and, to help pay for the aunt's ongoing expensive cancer treatments." Defendants take this expression of plaintiffs' intent to sell the property as demonstrating the loan was for a business purpose – "renovation of the property for sale." But the fact plaintiffs intended to sell the house after improving it does not necessarily demonstrate a business purpose; use of a loan to improve and sell the family home as a means of financing relatives' retirement and medical care is clearly a personal or family use. Defendants rely upon the assertions in the loan documents that the loan was for a business purpose, but plaintiffs maintain these assertions were part of the fraud perpetrated by the defendants, who plaintiffs claim mischaracterized the loan as one for business purposes in order to avoid the licensing requirements for residential mortgage loans. The trial court's conclusion the loan was a residential mortgage loan, despite its characterization in the loan documents, is supported by the allegations of plaintiffs' verified complaint

13

and the undisputed evidence that the loan was obtained in order to renovate the family residence that served as security for the loan.[11]

Defendants argue that the trial court erred in refusing to compel arbitration because their claim of fraud in the inducement of the contract can and should be decided by the arbitrator rather than the court.

Fraud in the inducement of a contract, unlike fraud in the execution, does not always vitiate an arbitration provision. Fraud in the "execution" of a contract " ' "goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is *void.* In such a case, it may be disregarded without the necessity of rescission." ' " (*Rosenthal, supra,* 14 Cal.4th at p. 415, quoting *Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028.) "Fraud in the inducement, by contrast, occurs when ' "the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable.* In order to escape from its obligations the aggrieved party must *rescind. . . .*" ' " (*Rosenthal,* at p. 415.)

Defendants rely upon the statement in *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323 (*Ericksen*) that "in the absence of indication of contrary intent, and where the arbitration clause is reasonably susceptible of such an interpretation, claims

---

[11] As Paniagua verified the complaint, its allegations, to the extent made from his personal knowledge, constitute evidence upon which the trial court could base its ruling. (*Coppinger v. Superior Court* (1982) 134 Cal.App.3d 883, 889 [allegations of verified complaint sufficient to establish prima facie case of fraudulent inducement in opposing motion to expunge lis pendens].)

14

of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) will be deemed subject to arbitration." *Erickson* involved a question of fraud "intertwined with performance of the agreement," in which the tenant law firm claimed it was fraudulently induced to enter the lease by the lessor's knowingly false representation that the premises were tenantable when in fact defective air conditioning made the premises untenantable. (*Id.* at pp. 315, 317, fn. 2.) The court distinguished this type of case from cases involving illegal agreements: "Questions of public policy which are implicated by an illegal agreement, and which might be ill-suited for arbitral determination, are not presented when garden-variety 'fraud in the inducement,' related to performance failure, is claimed. The latter is ideally suited for the arbitrator's expert determination." (*Id.* at p. 317, fn. 2.)

*Duffens, supra,* 161 Cal.App.4th 434, the case relied upon by the trial court here, upheld the denial of a motion to compel arbitration where the plaintiffs claimed fraud in the inducement of contracts that were found to be illegal because they did not comply with statutory requirements. The case involved " 'consulting agreements' " for matchmaking services that did not contain essential language required by statutes regulating "dating service contracts." (*Id.* at p. 440.)

*Duffens* discussed the *Moncharsh* court's distinction between illegal contracts, as to which an arbitration agreement will not be enforced, and contracts alleged only to contain an illegal provision (not related to the arbitration agreement), which remain arbitrable, with the alleged illegality a matter for the arbitrator to determine. (*Duffens, supra,* 161 Cal.App.4th at pp. 449–450.) In particular, *Duffens* noted *Moncharsh*'s observation that *Ericksen,* in holding the entire controversy arbitrable despite the fact that

15

fraud in the inducement of the contract could result in revocation as contemplated by section 1281.2, " '*distinguished that case from those in which a party claimed illegality of the underlying agreement.*' " (*Duffens,* at pp. 449–450; *Moncharsh, supra,* 3 Cal.4th at p. 30, fn. 13.) The *Duffens* court stated that, according to *Moncharsh*, cases of fraud in the inducement resulting in " 'disappointed expectation[s]' that may justify a 'revocation of the agreement' (Code Civ. Proc., § 1281.2), because of a failure of performance" "should be distinguished from those in which a party claimed *illegality of the underlying agreement.* (*Ericksen, supra,* 35 Cal.3d at pp. 316–317, fn. 2.) Apparently, this means that *where the underlying agreement is illegal under other accepted standards,* its arbitration clause can be avoided. (See *Moncharsh,* at p. 30, fn. 13.)" (*Duffens,* at p. 450.) In other words, although the plaintiffs in *Duffens* alleged fraud in the inducement that "normally might be arbitrable," the claimed illegality of the contracts would " 'void[] the entire contract.' " (*Id.* at p. 451.)

*Duffens* easily concluded the contracts at issue were illegal because the governing statutes expressly provide that contracts omitting the statutorily required language are "void and unenforceable." (*Duffens, supra,* 161 Cal.App.4th at pp. 453–454.) Recognizing that "even voidable contracts may contain enforceable arbitration clauses" and "illegal provisions may be severable if not central to the purpose of the agreement,"[12] the court

---

[12] *Duffens* stated, " 'Under California law, illegal provisions may be severable if not central to the purpose of the agreement. [Citations.]' ([Knight et al., California Practice Guide:] Alternative Dispute Resolution [(The Rutter Group 2007) Contracts], ¶ 5:144.5, p. 5–99.) There, the authors cite as authority for this proposition *Abramson v. Juniper Networks, Inc.* [(2004)] 115 Cal.App.4th 638, 658, 667. The 'taint of illegality and unconscionability cannot be removed from this arbitration agreement by

16

concluded the arbitration provisions in *Duffens* were not severable because the dating service statutes, reflecting the legislature's intent to regulate contracts for dating services "in a particular manner," "operate to exclude such contracts for dating services from the scope of the general rule that a court will refrain from determining the legality of voidable contracts that contain an arbitration clause, and will instead allow an arbitrator to do so. The defects in these agreements are central to the policy of the statutes, and the express language of the statues regarding unenforceability applies to the arbitration clauses as well." (*Id.* at p. 456.)

In the present case, as the trial court explained in its order, "It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker or a real estate salesperson within this state without first obtaining a real estate license from the department, or to engage in the business of, act in the capacity of, advertise as, or assume to act as a mortgage loan originator within this state without having obtained a license endorsement." (§ 10130.) "No individual may engage in business as a mortgage loan originator under this article without first . . . [¶] . . . [o]btaining and maintaining a real estate license . . . [¶] . . . [¶] [and] a real estate license endorsement pursuant to this article identifying that individual as a licensed mortgage loan originator." (§ 10166.02, subd. (b).)

"The purpose of the licensing requirement is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners." (*Schantz v. Ellsworth* (1971) 19 Cal.App.3d 289, 292–293.) The statutes provide for both civil and penal consequences of violating the

---

severing or restricting the objectionable terms. . . .' (*Id.* at p. 667.)" (*Duffens, supra,* 161 Cal.App.4th at p. 456.)

requirements. A person "engaged in the business or acting in the capacity of a real estate broker or a real estate salesperson" is prohibited from bringing or maintaining an action "for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he or she was a duly licensed real estate broker or real estate salesperson at the time the alleged cause of action arose." (§ 10136.) Acting as a real estate agent without the proper license is punishable by a fine and/or a jail term of up to six months. (§§ 10139, 10185.)[13]

One of the "guiding principles" followed by the *Duffens* court was stated in *Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 610–611, which refused to enforce an arbitration award based on a construction contract found to be illegal due to the contractor's lack of a valid license: " 'It seems clear that the power of the arbitrator to determine the rights of the parties is dependent upon the existence of a valid contract under which such rights might arise. [Citations.] In the absence of a valid contract no such rights can arise and no power can be conferred upon the arbitrator to determine such nonexistent rights.' " (*Duffens, supra,* 161 Cal.App.4th at p. 455.) So, here, a residential mortgage loan agreement negotiated and extended by individuals or entities not licensed to engage in such activities is unlawful under the real estate statutes described above. While we are aware of no statute expressly declaring such a contract void (unlike the situation in *Duffens,* where the

---

[13] Acting as a real estate broker, real estate salesperson or mortgage loan originator without the required license or license endorsement is a public offense punishable by a fine of up to $20,000 and/or a jail term of up to six months, or, for a corporation, a fine of up to $60,000. (§ 10139.) Willful violation, or knowing participation in the violation, of the requirements of the real estate division of the Business and Professions Code is a misdemeanor punishable by a fine of up to $10,000 and/or a jail term of up to six months. (§ 10185.)

18

governing statutes did so declare), contracts that are contrary "to the policy of express statutes . . . are illegal contracts" as well. (*Green v. Mt. Diablo Hospital Dist.* (1989) 207 Cal.App.3d 63, 73.)[14]

Contracts entered by an individual lacking the required license are not necessarily void ab initio where the proper license is in place during performance of the contract. (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412 (*MW Erectors*) [statute precluding unlicensed contractor from maintaining action to recover compensation under contract does not preclude recovery where contractor unlicensed at execution of contractor but fully licensed at all times during performance of contract]; *Fewel & Dawes, Inc. v. Pratt* (1941) 17 Cal.2d 85, 90 [acknowledging "unlicensed person is not precluded from recovering a commission if he secures such license by the time the contract is performed, although it was executed prior to the time he was licensed," but finding no enforceable obligation because license never acquired].) Here, however, there is no suggestion defendants were licensed to engage in residential loan transactions at any time relevant to the parties' agreements. In the context of construction contracts, *MW Erectors* noted that nonlicensure at the time of contracting does not negate the protection of the public served by the regulatory statutes "where all performance *was* licensed." (*MW Erectors,* at pp. 442–443.) Here, enforcing a contract entered *and performed* in violation of licensing requirements would be contrary to the public interest. Indeed,

---

[14] As noted in *Duffens,* " '[t]he Civil Code places illegal contracts in three groups: (1) those contrary to express statutes; (2) those contrary to the policy of express statutes, though not expressly prohibited; (3) those otherwise contrary to good morals. [Citation.] [Citations.]' " (*Duffens, supra,* 161 Cal.App.4th at p. 450, fn. 5, quoting 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts § 451, p. 492.)

the circumstances of this case—defendants' misrepresentation of themselves to the public as licensed to engage in residential mortgage loan transactions and employment of documents reciting the loan was for a business purpose despite the nature of the borrower and the security demonstrating the contrary—supports an inference that defendants deliberately mischaracterized the nature of the loan in the documents it presented for Paniagua's signature for the purpose of avoiding the applicable regulations.[15]

This case does not involve the sort of claim of "garden-variety 'fraud in the inducement,' related to performance failure" *Ericksen* described as "ideally suited for the arbitrator's expert determination." (*Ericksen, supra,* 35 Cal.3d at p. 317, fn. 2.) Instead, the fraud at issue here went to the very legality of the transactions. The trial court based its decision on the evidence supplied by the Bureau's desist and refrain order that around the time Paniagua entered the original loan agreement, Milestone and Hamilton were misrepresenting to the public that they were licensed to act as a real estate broker, real estate salesperson and/or mortgage loan originator, when in fact they did not hold any of these licenses. Absent the required licenses, it was unlawful for Milestone to enter the residential mortgage agreement with Paniagua. Accordingly, the trial court "properly made a preliminary factual determination that misleading circumstances existed and led to the entry into the agreements, supporting a conclusion the agreements are void,"

---

[15] Although the trial court made no factual findings on this point, it bears noting that the loan documents recited the loan was arranged by a licensed real estate agent—necessary to avoid the licensing requirements of the Financial Code (Fin. Code, §§ 22100, 22057)—but plaintiffs alleged the broker was selected by defendants unilaterally and worked with defendants without input from plaintiffs.

including the arbitration provisions within them.  (*Duffens, supra,* 161 Cal.App.4th at p. 456.)[16]

## DISPOSITION

The order denying the motion to compel arbitration is affirmed.  Costs to plaintiffs.

---

[16] Our resolution of the issues makes it unnecessary for us to address the parties' arguments as to whether the arbitration agreement was unconscionable.

_____

Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.

_Paniagua et al. v. Milestone Financial, LLC et al._ (A157183)